## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| XAVIER HERSOM and JOHN DOE, | |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF** |
| BILL J. CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; AYNE AMJAD, in her official capacity as Commissioner for the West Virginia Department of Health and Human Resources, Bureau of Public Health, and State Health Officer; and MATTHEW WICKERT, in his official capacity as the State Registrar for Vital Statistics, | Civil Action No.: 2:21-cv-00450 |
| Defendants. | |

## NATURE OF ACTION

1.     Plaintiffs Xavier Hersom and John Doe are transgender men, born in the state of West Virginia, who wish to correct the gender markers on their West Virginia birth certificates. They further wish to be issued amended birth certificates that do not disclose their transgender status by indicating that the gender marker was amended, or by including their prior typically female names given to them at birth. Plaintiffs simply seek birth certificates they can use without being forced to disclose deeply personal and private information about their transgender status, which could expose them to discrimination and other harms, including a high risk of violence. Xavier Hersom and John Doe know themselves to be men and live all aspects of their lives as men. As such, both have requested that the West Virginia Department of Health and Human Resources ("Department of Health and Human Resources") issue them new birth certificates that

list their gender as male and remove their prior legal names completely, but these requests were denied.

2.      Identity documents are critical to every person's ability to navigate through life. Identity documents are needed to access employment, education, housing, health care, banking, travel, and government services. A birth certificate is a basic identity document routinely relied upon for many identity-verification purposes, including as a prerequisite to obtain other essential identity documents like a driver's license, state-issued identity card, and United States passport.

3.      The Department of Health and Human Resources provides most people born in West Virginia with birth certificates that match their gender. However, the Department of Health and Human Resources bars only transgender people from obtaining birth certificates matching their gender.

4.      The Department of Health and Human Resources refuses to correct the gender markers on transgender people's birth certificates regardless of what steps a person may have taken in order to obtain recognition of their gender.

5.      The Department of Health and Human Resources' categorical bar stands in sharp contrast to the approach of nearly all other states and the District of Columbia, which have established processes by which transgender people can correct the gender marker on their birth certificate. Additionally, the Department of Health and Human Resources' categorical bar is inconsistent with the West Virginia Division of Transportation's policy that allows transgender people to correct their gender marker on their West Virginia–issued driver's license or identification card.[1]

---

[1] *See, e.g.*, W. VA. DIV. TRANSP., *Driver's Licenses and ID Cards*, https://transportation.wv.gov/DMV/Drivers/Pages/Drivers-Licenses.aspx (last visited July 27, 2021) (providing procedure for a gender marker correction on a driver's license or state-issued

6.      In addition, when the Department of Health and Human Resources makes amendments to any part of a birth certificate, its policy is for the new birth certificate to indicate that amendments were made either by using a strike-through line that leaves the prior information visible (as was done for Plaintiffs after they legally changed their names), or by indicating which field of the birth certificate was amended. The inclusion of a prior typically female legal name on the birth certificate of transgender men like Plaintiffs reveals their transgender status. And if the Department of Health and Human Resources were to amend Plaintiffs' gender markers but indicate on the amended birth certificate that an amendment to that provision was made, that would also disclose their transgender status to anyone to whom they present their birth certificates.

7.      The Department of Health and Human Resources' policies of i) refusing to issue gender marker changes for transgender people, and ii) refusing to issue a transgender person an amended birth certificate without revealing a person's transgender status through indications of amendments, erect a barrier to the full recognition, participation, and inclusion of transgender people in society and subject them to discrimination, privacy intrusions, harassment, humiliation, stigma, harm to their health, and violence.

8.      These policies violate federal constitutional guarantees, including the rights to equal protection, due process, and freedom from compelled speech. As confirmed by the practices adopted by other states, there is no government justification to support the Department of Health and Human Resources' refusal to provide transgender people with birth certificates that match their gender and do not otherwise reveal their transgender status.

---

ID, which requires one form to be filled out by the applicant and a licensed physician, and no additional state-imposed administrative barriers or an expectation of a court order).

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) because Plaintiffs seek redress for the deprivations of rights guaranteed by the Constitution of the United States. Plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983 because the deprivation occurred under color of state law.

10.     This Court has the authority to enter a declaratory judgement and to provide injunctive relief pursuant to 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and 42 U.S.C. § 1983.

11.     Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(b) because each of the Defendants resides in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

12.     The Court has personal jurisdiction over Defendants because they are domiciled in West Virginia and because their refusal to provide Plaintiffs with birth certificates matching their gender and not revealing their transgender status occurred within West Virginia.

## PARTIES

**Plaintiffs**

13.     Plaintiff Xavier A.M. Hersom is a man who was born in West Virginia and currently resides in Martinsburg, West Virginia. Mr. Hersom is transgender. Mr. Hersom requires a West Virginia birth certificate that reflects his gender as male, rather than the female gender assigned to him at birth, and that does not disclose his transgender status.

14.     Plaintiff John Doe is a man who was born in West Virginia and currently resides in Tennessee. Mr. Doe is transgender. Mr. Doe requires a West Virginia birth certificate that

reflects his gender as male, rather than the female gender assigned to him at birth, and that does not disclose his transgender status.[2]

**Defendants**

15.     Defendant Bill J. Crouch is the Cabinet Secretary of the Department of Health and Human Resources. In this capacity, he is the head of that agency.

16.     Defendant Ayne Amjad, MD, MPH, is the Commissioner for the Department of Health and Human Resources' Bureau of Public Health. In her capacity as Commissioner, she is the chief executive, administrative, and fiscal officer for the Bureau for Public Health. W. Va. Code § 16-1-6. In this role, she is also the head of the West Virginia Health Statistics Center with the authority to appoint the State Registrar of Vital Statistics. W. Va. Code § 16-5-2; W. Va. Code § 16-5-4.

17.     Defendant Matthew Wickert is the State Registrar for Vital Statistics. In that capacity, he has the authority to direct and supervise the system of vital statistics and the operation of the Health Statistics Center. W. Va. Code § 16-5-5.

## FACTS

**Background Information Regarding Transgender People**

18.     Transgender people are people who have a gender identity that differs from the sex assigned to them at the time of their birth.

---

[2] Mr. Doe seeks anonymity in these proceedings to avoid potential stigmatization and discrimination if his transgender status were to become publicly known. A Motion to Proceed Anonymously was filed simultaneously with this Complaint.

19.     Gender identity is a well-established medical and psychological term that refers to a person's fundamental, internal sense of their gender. It is a core characteristic of human identity that everyone possesses. Gender identity is innate and typically fixed at an early age.

20.     A person's gender identity cannot be voluntarily altered. Attempts to change a person's gender identity in order to align it with the person's birth-assigned sex are not only futile but incredibly dangerous to the individual, subjecting them to psychological harm, and increased risk of suicide and self-harm.

21.     The gender marker designated on a birth certificate at the time of birth is almost always based solely on the appearance of an infant's external genitalia. However, it is well-established among medical professionals that a person's sex is determined by a variety of components, including genitalia, chromosomes, hormones, reproductive anatomy, secondary sex characteristics, and gender identity.

22.     When components of sex, including genitalia, chromosomes, hormones, reproductive anatomy, secondary sex characteristics, and gender identity, do not align as all typically male or all typically female, a person's gender identity is what determines the gender a person lives as, and how the person should be recognized for social and legal purposes.

23.     Many transgender people experience gender dysphoria. Gender dysphoria is a medically recognized condition defined by a marked incongruence between a person's gender identity and the sex they were assigned at birth, when accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

24.     The well-accepted standards of care for the treatment of gender dysphoria, set forth by the World Professional Association for Transgender Health, seek to help a person live in accordance with their gender identity, which alleviates the distress associated with gender

dysphoria. Treatment typically involves social transition and can include medical treatments, including hormone therapy and surgeries, to bring a person's body into alignment with their gender identity. These standards of care are recognized by all of the major medical and mental health professional organizations in the United States.

25.     Social transition entails living one's life consistently with one's gender identity, such as changing clothing and hairstyle, name, and pronouns, using gender-specific facilities and engaging in gender-specific activities that match one's gender, and using identity documents with a gender marker that reflects one's gender.

26.     The global medical community and the major medical associations in the United States recognize the critical and often life-saving benefits to the health and wellbeing of transgender people when they are able to live consistently with their gender identity in all aspects of their lives.

27.     Forcing transgender people to use identity documents that do not match their gender identity, or to go without identity documents, is inconsistent with medical protocol because it prevents a person from fully living consistently with their gender identity.

**The Need for Birth Certificates That Match One's Gender and Do Not Disclose One's Transgender Status**

28.     A birth certificate is an essential government-issued document that each person uses to establish their identity throughout their lifetime. That is why the government routinely makes copies of a birth certificate available to the person named on the birth certificate, rather than merely reserving the document solely for the government's use.

29.     Transgender people are no different than non-transgender people with respect to the need to access a birth certificate that reflects who they are and that they can actually use in their lives.

30.     Additionally, for transgender people who have struggled for years with the impact of external invalidation of their gender identity, the knowledge that one's identification documents label them with the wrong gender and the name given to them at birth (if typical of their birth-assigned sex) can cause serious psychological injury and undermine their medical treatment for gender dysphoria.

31.     Many transgender people are perceived by others consistent with their gender identity. This is especially so for transgender people who have received gender-affirming medical treatments to align their bodies with their gender. For example, hormone therapy affects secondary sex characteristics, which involve the skeletal structure, fat distribution in the body, skin texture, facial hair, and voice, among other things. In addition, surgeries are available to further bring a person's body into alignment with their gender. For many transgender people who have received these types of gender-affirming medical care, nothing about their outward appearance would indicate that they are transgender.

32.     A transgender man born in West Virginia who has a birth certificate designating him as female is burdened with an identity document that conflicts not only with his gender but also with how others perceive him. Similarly, a transgender woman born in West Virginia who has a birth certificate designating her as male is burdened with an identity document that conflicts not only with her gender but also with how others perceive her.

33.     Denying transgender people birth certificates that match their gender identity and that do not reveal their transgender status discloses private information in contexts where this information would otherwise remain undisclosed, regardless of a person's desire not to disclose that personal information. Transgender people denied birth certificates that reflect their gender and that do not reveal their transgender status are deprived of significant control over the

8

circumstances surrounding the disclosure of their transgender status, including when, where, how, and to whom their transgender status is disclosed.

34.     A person's transgender status is profoundly personal information in which a transgender person has a reasonable expectation of privacy. Involuntary disclosure of that information can also put a person at risk of harassment, discrimination, and bodily harm.

35.     Transgender people often face significant harmful treatment when others learn that they are transgender. A 2016 survey of over 27,000 transgender people across the country found that the transgender community is more likely to suffer abuse, harassment, discrimination, and violence than the population at large.

36.     According to the Report of the 2015 U.S. Transgender Survey (2016) ("USTS"): [3]

   a.   Around a quarter (24%) of respondents had been physically attacked in a K-12 school because people perceived them as transgender.

   b.   In the year prior to completing the survey, 27% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or expression.

   c.   Nearly half (47%) of respondents had been sexually assaulted during their lifetime.

   d.   Among respondents who had interacted with police, 58% of those whom the police perceived as transgender experienced some form of mistreatment.

---

[3] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey* (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ("USTS").

    e.   Thirty-nine percent of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population.

    f.   Forty percent of respondents attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population (4.6%).

37.    The findings of the USTS reflect the lived reality of many transgender people across the country and demonstrate the significant danger to the health and safety of transgender people that results when their transgender status is involuntarily disclosed.

38.    The USTS specifically examined the experiences of transgender people whose identity documents, including birth certificates, did not state a name and gender that align with their gender identity and presentation. Of those respondents, 32% reported being harassed, denied services, and/or attacked.

**West Virginia's Birth Certificate Policies**

39.    No provision in the statutory code of West Virginia prohibits Defendants from permitting transgender people to correct the gender marker on their birth certificates to reflect their gender.

40.    Rather, the code is clear that birth certificates and other vital records are to be amended in accordance with rules established by the Department of Health and Human Resources.

41.    The Department of Health and Human Resources is statutorily charged with establishing the requirements for the amendment of West Virginia birth certificates. It has fulfilled this mandate by promulgating W. Va. Code R. § 64-32-12.2.a.1, which provides the

procedure by which individuals may petition the State Registrar to amend information on their vital records. W. Va. Code § 16-5-3.

42.     This rule establishes a process for amending birth certificates within the first year of the subject's birth, and another process for all other amendments. W. Va. Code R. § 64-32-12.

43.     Pursuant to W. Va. Code R. § 64-32-12.2.a.1, requests to amend information on a birth certificate must be supported by a notarized affidavit that provides information to identify the birth certificate, the incorrect data as listed on the certificate, and the correct data as it should appear. This affidavit must be accompanied by one or more items of documentary evidence that supports the alleged facts.

44.     Despite this, the Department of Health and Human Resources refuses to amend the gender marker on the birth certificates of transgender people like Plaintiffs.

45.     When transgender people request a gender marker amendment, the Department of Health and Human Resources directs them to obtain a circuit court order directing the amendment. But this is impossible because the Supreme Court of Appeals of West Virginia held that the state vital records law does not give West Virginia circuit courts statutory authority to amend the gender marker on West Virginia birth certificates. *See In re G.M.*, 2020 WL 3408589, *3 (W. Va. 2020).[4]

46.     As a result of the Department of Health and Human Resources' policy of refusing to amend the gender marker on a transgender person's birth certificate, transgender people born in West Virginia are unable to obtain a birth certificate with a corrected gender marker.

---

[4] Plaintiff John Doe was the Petitioner in *G.M.*

47.     Defendants further burden transgender West Virginians by issuing amended birth certificates that reveal their transgender status. The Department of Health and Human Resources amends birth certificates by two different methods, both of which would reveal a transgender person's transgender status. One method is to make the amendment and then indicate on the new birth certificate which information was amended. W. Va. Code R. § 64-32-12.8.a.2. If a transgender person were able to amend their gender marker and the newly issued birth certificate indicated that the gender marker was amended, that would reveal a person's transgender status. The second method of amendment is by strike-through. Through this process, the Department of Health and Human Resources strikes through the information to be amended, leaving it legible, and inserts the corrected information above the strike-through. W. Va. Code R. § 64-32-12.8.a.3. A transgender person who has amended their name—and if they were able to, their gender marker—would still have the incorrect gender marker and typically feminine or masculine name given at birth legible on their new birth certificate, revealing their transgender status to anyone who sees it.

**Plaintiff Xavier A. M. Hersom**

48.     Plaintiff Xavier A. M. Hersom is a 26-year-old man born in Spencer, West Virginia, who currently resides in Martinsburg, West Virginia.

49.     Mr. Hersom is a full-time college student at Shepherd University, where he is currently working towards obtaining his bachelor's degree in nursing. In addition to studying full-time, Mr. Hersom also works as a part-time facilitator with Greater Recovery and Community Empowerment, where he is a trainer for life coaches and recovery coaches that support those struggling with substance abuse.

50.     Mr. Hersom is transgender and needs his West Virginia birth certificate to be corrected to reflect his gender as male, rather than the female gender that was assigned to him at birth, and that does not disclose his transgender status.

51.     Growing up, Mr. Hersom always knew that he was a boy but did not know that transgender people existed or that there were others who felt the same way he did and lived their lives according to who they knew themselves to be rather than the sex assigned to them at birth. He believed that his feelings were not acceptable and that vocalizing his feelings would be received harshly by those around him.

52.     In 2016, Mr. Hersom first learned of transgender people, the ability to transition medically, and that living his life as a man was possible. Still, he did not immediately disclose his transgender status because he feared he would be stigmatized.

53.     Mr. Hersom eventually socially transitioned in late 2016, meaning he has consistently lived his life as a man for more than five years.

54.     In 2017, Mr. Hersom was diagnosed with gender dysphoria. With the recommendation of his doctors, he began hormone therapy. Before 2021, Mr. Hersom originally had to travel hours from his West Virginia home to Washington, D.C. to obtain this health care because it was not available in the West Virginia panhandle region where he lives. In addition to hormone therapy, Mr. Hersom underwent chest reconstruction surgery in 2018 as part of his treatment for gender dysphoria. Mr. Hersom has noticed a significant improvement in his health as a result.

55.     Access to gender-affirming medical care has greatly impacted and benefited Mr. Hersom's health and wellness. Before beginning hormone therapy and having surgery, he felt uncomfortable in his body. When he first came out as a transgender man before receiving

appropriate health care, he avoided going out in public as much as possible because people would continuously address him using female pronouns and he was too afraid to correct them. He worried for his safety when he dressed in men's clothes because he felt people did not fully see him as male. Mr. Hersom feels liberated now that he has access to gender-affirming health care because the world sees him as the man he has always known himself to be. He is rarely misgendered by people he encounters in public.

56.     Although Mr. Hersom has consistently lived as a man for over five years, this does not mean that Mr. Hersom discloses his transgender status in all aspects of his life.

57.     Mr. Hersom's decision to control the disclosure of this information is based in part on the hostility and harassment he has previously experienced when revealing his transgender status. Mr. Hersom was abandoned by friends and acquaintances when he told them he was transgender. He was also targeted and harassed by people on Facebook when they learned that he is transgender.

58.     These experiences led Mr. Hersom to decide to only disclose his transgender status in circumstances in which he feels safe.

59.     In early 2018, Mr. Hersom began the process of legally changing his name by seeking a court ordered name change.

60.     On January 16, 2018, the Circuit Court of Berkeley County, West Virginia issued Mr. Hersom a Final Order for Change of Name, granting his petition to change his legal name to Xavier A. M. Hersom.

61.     Mr. Hersom took this court order to the Division of Vital Records to request an amendment to the name on his birth certificate. At that same time, Mr. Hersom asked the official whether he could also change the gender marker on his birth certificate.

62.     The Division of Vital Records approved his request to amend the name on his birth certificate and issued him an amended birth certificate showing his prior typically-female name with a strike-through and inserting his new legal name above it

63.     With respect to his request to correct the gender marker on his birth certificate, the official informed Mr. Hersom that he would need to return to court to obtain an order to change the gender marker.

64.     In June 2020, Mr. Hersom filed a Petition for Change of Gender with the clerk of the Circuit Court of Berkeley, West Virginia and paid a $200.00 filing fee in order to obtain a hearing.

65.     On July 23, 2020, the Circuit Court of Berkeley, West Virginia issued an order denying Mr. Hersom's Petition for Change of Gender, based on the West Virginia Supreme Court of Appeal's holding in *In re G.M.* that state law does not give circuit courts jurisdiction to correct gender markers on birth certificates.

66.     Mr. Hersom has corrected his legal name and gender marker on all of his other identity documents, including his passport, social security card, and driver's license.

67.     Mr. Hersom is a man, lives every aspect of his life as a man, has a typically masculine name, and receives gender-affirming medical care to align his body with his male gender identity. Mr. Hersom's gender is male. Yet, West Virginia refuses to provide Mr. Hersom with a birth certificate that identifies his gender as male and that does not disclose the typically female name given to him at birth.

68.     Being denied access to a birth certificate that accurately reflects his gender as male and that does not disclose the typically female name given to him at birth has been a substantial burden in Mr. Hersom's life.

15

69.     When he applied to obtain a U.S. passport, for example, Mr. Hersom was required to submit his birth certificate (which identifies him as female) along with several other forms of identification that identify him as male. He experienced stress about revealing his transgender status to the agent and the risk of harassment and other mistreatment. He also feared that having a birth certificate with a female gender marker, while his other identity documents reflected his male gender, would prevent him from getting the passport. He wrote a letter to explain the discrepancies, and fortunately was able to obtain his passport with a male gender marker, but not without anxiety.

70.     Defendants' refusal to issue Mr. Hersom a birth certificate that reflects his gender resulted in the involuntary disclosure of the private and personal information of his transgender status in order to obtain a passport.

71.     Mr. Hersom lives with the fear that he will have to present his birth certificate which, because of the female gender marker and inclusion of his prior legal name, would unwillingly disclose that he is transgender.

72.     Moreover, being required to carry a birth certificate that identifies him as female and associates him with a typically female name undermines Mr. Hersom's treatment for gender dysphoria and causes him distress because it prevents him from living fully consistently with his male gender identity. It also deprives him of his autonomy, disrespects his identity, and fundamentally contradicts who he knows himself to be.

**Plaintiff John Doe**

73.     Plaintiff John Doe is an 18-year old man from Parkersburg, West Virginia. Mr. Doe currently resides in Tennessee.

74.      Mr. Doe recently graduated from high school and he intends to study biology in college with the ultimate goal of being a veterinarian.

75.      Mr. Doe is transgender. He needs a West Virginia birth certificate that reflects his gender as male, rather than the female gender that was assigned to him at birth, and that does not disclose his transgender status.

76.      Growing up, Mr. Doe always knew that he was a boy. In the fourth grade he was cast as a male character in a school play. When his teachers drew on a moustache, he liked it so much that he did not wash it off for days. Once, at basketball camp, he was sorted into the boy's section. Because it felt right to play with the boys, he did not inform the instructor. Both of these experiences were affirming to Mr. Doe and his knowledge that he was transgender.

77.      In 2015, at twelve years old, Mr. Doe socially transitioned. Mr. Doe began wearing his hair in a typically masculine style and wearing typically male clothing. Mr. Doe asked to be called a typically male name and for others to use masculine pronouns, and he began using male restrooms. Mr. Doe has lived authentically as a man in all aspects of his life for over six years.

78.      In 2017, Mr. Doe's physician diagnosed him with gender dysphoria and recommended he begin hormone therapy as part of his treatment for gender dysphoria. Since this diagnosis, Mr. Doe has consistently been on hormone therapy, which has broadened his shoulders, deepened his voice, and induced facial hair growth.

79.      In addition to hormone therapy, Mr. Doe and his medical provider determined that he should undergo gender-affirming surgery. In 2018, Mr. Doe had chest reconstruction surgery to create a typical male chest as part of his treatment for gender dysphoria.

80.     Mr. Doe has corrected his legal name and gender marker on his social security records, his driving learner's permit, and his school records in Tennessee. Mr. Doe's West Virginia birth certificate remains the only identity document with an incorrect gender marker. In addition, although he was permitted to change his name on his birth certificate after he had his name legally changed, the document still includes the typically female name given to him at birth with a strike-through.

81.     Mr. Doe is private about his transgender status in most areas of his life and only discloses this information in limited circumstances where necessary, like in health care settings, and to family and close friends.

82.     Mr. Doe's decision to keep his transgender status private is based in part on the hostility and harassment he previously experienced when he disclosed his transgender status. When he began taking testosterone, for example, he could not hide that he was transgender at his previous high school. He had to quit band because his bandmates would often shove him, yell slurs in the hallway, and intentionally misgender him to make a point that they disapproved of his transgender status. Further, because he was aware of the high rates of violence against transgender people, he was too scared to use the boys' restroom at school.

83.     Mr. Doe's birth certificate has caused him to be outed as transgender to strangers in a public area. When he went to obtain a Tennessee driving learner's permit, Mr. Doe provided his birth certificate, West Virginia driving learner's permit, and School Proof of Enrollment to verify his identity as required by state law. The clerk noticed the discrepancy in the gender markers on his birth certificate and his West Virginia driving learner's permit. She also noticed the strikethrough on his birth certificate, which documented a change from a typically female name to a typically male name. She asked Mr. Doe to explain the discrepancy. At the time, Mr.

18

Doe was a minor, so his father cleared up the clerk's confusion by providing affidavits from Mr. Doe's medical providers attesting to his male gender. Because they were in a public section of a crowded DMV, numerous strangers overheard their discussion.

84.     Although the clerk ultimately produced a driving learner's permit with the correct male gender marker, it was anxiety-inducing for Mr. Doe while he waited and wondered if he would get his driving learner's permit. And it was stressful for him to be outed as transgender in a crowded public place. Specifically, he feared someone who overheard would confront and harass him.

85.     This event highlights why it is necessary for Mr. Doe's birth certificate to indicate his correct gender marker and not include his prior legal name. Both corrections are needed to prevent Mr. Doe from having to involuntarily disclose his transgender identity. Mr. Doe fears that one day he will be denied housing or public accommodations, or fail a background check while pursuing an employment opportunity, solely because his birth certificate does not reflect his gender. Moreover, he fears the embarrassment and possible harassment or assault which might occur if he is once again required to disclose his transgender status to strangers in public.

86.     All of Mr. Doe's identity documents other than his birth certificate identify him as male and include only his current legal name. The idea of being outed as transgender causes Mr. Doe significant stress. Moreover, being forced to carry a birth certificate identifying him as female and associating him with a typically female name undermines Mr. Doe's treatment for gender dysphoria and causes him distress because it prevents him from living fully consistently with his male gender identity. It also deprives him of his autonomy, disrespects his identity, and fundamentally contradicts who he knows himself to be.

## CAUSES OF ACTION PURSUANT TO 42 U.S.C. § 1983

## FIRST CAUSE OF ACTION
### Equal Protection Violation

87.     Plaintiffs incorporate paragraphs 1 through 86 as though fully set forth herein.

88.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause protects individuals and groups from discrimination by the government.

89.     Under the Equal Protection Clause, government discrimination based on gender is subject to heightened judicial scrutiny and is therefore presumptively unconstitutional. The Equal Protection Clause protects individuals from discrimination based on gender, including discrimination based on failure to conform to stereotypes associated with a person's gender assigned at birth.

90.     Under the Equal Protection Clause, government discrimination based on transgender status is also subject to at least heightened scrutiny and is presumptively unconstitutional. Transgender individuals as a group possess all the indicia of a suspect or quasi-suspect class that have been identified by the Supreme Court as triggering heightened scrutiny.

     a.  Transgender people have suffered a long history of extreme discrimination that continues to this day.

     b.  Transgender people are a discrete and insular minority who lack the political power to protect themselves through the legislative process.

     c.  A person's transgender status does not affect or limit one's ability to contribute to society.

     d.  Being transgender is a core, defining trait that is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

91.     The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers discriminates against transgender people on the basis of sex and transgender status. When the government identifies a person's gender on a birth certificate, the government literally creates a classification on the basis of sex.

92.     The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers intentionally discriminates against transgender people on the basis of sex and transgender status by depriving transgender people born in West Virginia of birth certificates that reflect their gender. Defendants deny transgender people access to birth certificates that can be used without sacrificing their privacy, health, safety, dignity, and autonomy. Non-transgender people born in West Virginia have access to birth certificates that reflect their gender. Every time a non-transgender West Virginian needs to show their birth certificate to a third party, they can do so without sacrificing their privacy, health, safety, dignity, and autonomy.

93.     The Defendants' discrimination against Plaintiffs based on their sex and transgender status fails to satisfy intermediate scrutiny because it is not substantially related to an important state interest.

94.     The Defendants' discrimination against Plaintiffs based on their sex and transgender status does not even withstand rational basis review.

95.     The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers is also invalid under any level of constitutional scrutiny because its sole purpose is to disadvantage a specific class of people, which is not a legitimate government interest.

96.     The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers denies Plaintiffs and other transgender people born in West Virginia equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution.

97.     The Defendants are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983. Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring West Virginia's policy of refusing to issue transgender people birth certificates with corrected gender markers unconstitutional and enjoining its enforcement.

### SECOND CAUSE OF ACTION
### Due Process Violation

98.     Plaintiffs incorporate paragraphs 1 through 97 as though fully set forth herein.

99.     The Fourteenth Amendment to the U.S. Constitution provides in part that no state shall, "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

100.     The Due Process Clause protects individuals from government actions that infringe on certain substantive rights enshrined in the liberty interest that it guarantees, including the right to privacy. This fundamental right to privacy proscribes *inter alia* state disclosure of information that is highly personal and intimate. Courts apply strict scrutiny when reviewing challenges to state action that results in the involuntary disclosure of such private information.

101.     The fact that a person is transgender is highly personal and intimate information. A reasonable person would find the involuntary disclosure of one's transgender status to be deeply intrusive. The involuntary disclosure of a person's transgender status can also cause significant harm and place that person's safety and bodily integrity at serious risk of danger. This

harm and risk of danger are substantial and restrict the ability of transgender people to live in a manner consistent with their gender and to fully participate in society.

102.     The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers and their policy of refusing to issue a transgender people amended birth certificates that do not reveal their transgender status through indications of amendments violate the privacy rights of transgender individuals by forcing them to involuntarily disclose their transgender status and stripping them of significant control over the circumstances surrounding such disclosure. The policies leave transgender people born in West Virginia with birth certificates that expose their transgender status to any and all persons to whom it is presented.

103.     The Defendants' policies of refusing to correct the gender marker on transgender people's birth certificates and refusing to issue transgender people amended birth certificates that do not disclose their transgender status further infringe upon the liberty interests of transgender people by interfering with their right to live in accordance with their gender identity. The constitutionally protected right to dignity, personhood, and bodily autonomy free from undue government intervention necessarily includes the right to define and express one's gender identity and the freedom to not have the government treat one in a manner contrary to one's gender.

104.     The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers and their policy of refusing to issue transgender people amended birth certificates that do not reveal their transgender status through indications of amendments do not further any compelling (or even legitimate) state interest nor are Defendants' policies narrowly tailored or the least restrictive method to promote a state interest.

105.     Accordingly, Defendants are liable for violating the Plaintiffs' Fourteenth Amendment rights to Due Process, pursuant to 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring their policies of refusing to correct the gender marker on transgender people's birth certificates and refusing to issue transgender people amended birth certificates that do not disclose their transgender status through indications of amendments unconstitutional and enjoining their enforcement.

### THIRD CAUSE OF ACTION
### First Amendment Violation

106.     Plaintiffs incorporate paragraphs 1 through 105 as though fully set forth herein.

107.     The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. This proscription is made applicable to the states through the Fourteenth Amendment. U.S. CONST. amend. XIV.

108.     The First Amendment protects the right to speak and to refrain from speaking.

109.     The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers and their policy of refusing to issue transgender people amended birth certificates that do not reveal their transgender status through indications of amendments violate the First Amendment rights of the Plaintiffs to refrain from speaking by compelling them to disclose private information about their transgender status to each person that sees their birth certificates.

110.     The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers and their policy of refusing to issue transgender people amended birth certificates that do not reveal their transgender status through indications of amendments further violate the Plaintiff's First Amendment rights to refrain from speaking by forcing them to identify themselves with a gender and a name that fundamentally conflict with the core of who

they know themselves to be. Pursuant to these policies, Defendants condition Plaintiffs' ability to equally participate in society on their endorsement of the government's beliefs about the Plaintiffs' own genders.

111.    The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers and their policy of refusing to issue transgender people amended birth certificates that do not reveal their transgender status through indications of amendments additionally violate the Plaintiffs' First Amendment right to speak by preventing them from expressing their gender in any circumstance in which they must present a birth certificate.

112.    The Defendants' policy of refusing to issue transgender people birth certificates with corrected gender markers and their policy of refusing to issue transgender people amended birth certificates that do not reveal their transgender status through indications of amendments do not further any compelling (or even legitimate) state interest, nor are Defendants' policies narrowly tailored or the least restrictive method to promote a state interest.

113.    Accordingly, Defendants are liable for violating the Plaintiffs' First Amendment rights to freedom of speech, pursuant to 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring their policies of refusing to issue transgender people birth certificates with corrected gender markers and refusing to issue transgender people amended birth certificates that do not reveal their transgender status through indications of amendments unconstitutional and enjoining their enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue a judgment declaring the Defendants' policies of refusing to correct the gender marker on transgender people's birth certificates and refusing to issue transgender people

amended birth certificates that do not disclose their transgender status through indication of amendments unconstitutional;

       B.     Issue a judgment permanently enjoining Defendants, their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them from denying requests made by transgender people born in West Virginia for an amended birth certificate that i) corrects the gender marker without indicating that an amendment to that information was made, and ii) completely removes the prior legal name when there has been a legal name change;

       C.     Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

       D.     Grant any injunctive or other relief that this Court deems just, equitable, and proper.

Dated: August 12, 2021

Respectfully submitted,

By: /s/ Loree Stark
_____

Taylor Brown*
Leslie Cooper*
Malita Picasso*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
tbrown@aclu.org
lcooper@aclu.org
mpicasso@aclu.org

Loree Stark (WV Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF
WEST VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Alexander Chen*
LGBTQ+ ADVOCACY CLINIC
WILMERHALE LEGAL SERVICES CENTER
OF HARVARD LAW SCHOOL
Harvard Law School
122 Boylston St.
Jamaica Plain, MA 02130
Phone: (617) 390-2656
achen@law.harvard.edu

* Statements of Visiting Attorneys
Forthcoming

Attorneys for Plaintiffs